# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

KEVIN BRIAN MITCHELL,

                                    Plaintiff,

v.

MARK RICHTER, SERGEANT FENN,
CORRECTIONAL OFFICER HANSEN,
CORRECTIONAL OFFICER JOHNSON,
CORRECTIONAL OFFICER IVERSON,
CORRECTIONAL OFFICER KRUEGER,
DEPUTY WALTER, DR. KAREN BUTLER,
NURSE TRACY, NURSE BRENDA,
NURSE LISA, NURSE NICK, and
CAPTAIN BRINKMAN,

                                    Defendants.

Case No. 15-CV-1520-JPS

**ORDER**

## 1.    INTRODUCTION

Plaintiff Kevin Brian Mitchell ("Mitchell"), a prisoner, brings this action pursuant to 42 U.S.C. § 1983 against Defendants, prison officials at Sheboygan County Detention Center ("Sheboygan"), for a host of incidents in which they allegedly violated his constitutional rights. The Defendants have all filed motions for summary judgment and have separated themselves into three groups: (1) Dr. Karen Butler ("Butler"); (2) nurses Brenda, Lisa, Nick, and Tracy (the "Nurse Defendants"); and (3) correctional officers Richter, Fenn, Hansen, Johnson, Iverson, Krueger, Walter, and Brinkman (the "Officer Defendants"). *See* (Docket #94, #100, #106, #122). Mitchell filed his own motion for summary judgment. (Docket #115). All the pending motions are fully briefed and, for the reasons stated below, the Court will grant summary judgment to all Defendants and dismiss this action.

## 2. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). The court must not weigh the evidence presented or determine credibility of witnesses; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). The party opposing summary judgment "need not match the movant witness for witness, nor persuade the court that [his] case is convincing, [he] need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

## 3. RELEVANT FACTS

### 3.1 Mitchell's Failure to Dispute the Material Facts

Most of the relevant facts are undisputed, due in no small measure to Mitchell's failure to dispute them. Before recounting the relevant facts, the Court will briefly set forth the procedural history and substantive failings of Mitchell's submissions.

In the Court's scheduling order, entered June 2, 2016, Mitchell was warned about the requirements for supporting and opposing a motion for

summary judgment. (Docket #43 at 1–2). Accompanying that order were copies of Federal Rule of Civil Procedure 56 and Civil Local Rule 56, both of which describe in detail the form and contents of a proper summary judgment submission. In their motions for summary judgment, Defendants also warned Mitchell about the requirements of Federal and Local Rule 56. In connection with their motions, Defendants filed supporting statements of material facts that complied with the applicable procedural rules. (Docket #96, #101, #108). They contained short, numbered paragraphs concisely stating those facts which Defendants proposed to be beyond dispute, with supporting citations to the attached evidentiary materials.

On December 16, 2016, Mitchell submitted a four-page, unsigned document that purported to be a motion for summary judgment. (Docket #115). The motion was not accompanied by a statement of material facts as required by the Federal or Local Rules. *See* Fed. R. Civ. P. 56(c); Civ. L. R. 56(b)(1). Without explanation, it was also filed a day after the dispositive motion deadline, which had been set since the Court entered its trial scheduling order in June 2016.[1]

His response to Defendants' motions for summary judgment was no better. Mitchell filed several documents which appear to challenge specific paragraphs in the Officer Defendants' declarations. (Docket #130, #131, #132). He also filed a similar document with respect to the Officer Defendants' statement of material facts. (Docket #133). In these documents, Mitchell does not reproduce each paragraph in the original and then provide a response;

---

[1]Defendants filed separate responses to Mitchell's motion for summary judgment. (Docket #120, #138, #139). Noting that his motion did not comport with the Federal or Local Rules, Defendants simply incorporated their evidence and argument from their own motions for summary judgment.

instead, he seems to comment only on those averments or statements of fact to which he takes exception.

Mitchell submitted several other documents as well. First, he filed an unsworn, narrative statement purporting to be his affidavit, but which reads more like a legal brief. (Docket #134). Second, he filed his own statement of material facts, though most of his assertions of fact lack citation to evidence. (Docket #135). Third, he filed a legal brief. (Docket #136). Finally, he filed a document purporting to be another motion for summary judgment, to which he attached nearly 118 pages of exhibits. (Docket #137). Many of these exhibits come from a time period not relevant to this case, and many others are simply illegible. This "motion" was not filed until January 27, 2017, over one month after the dispositive motion deadline. Moreover, none of Mitchell's submissions acknowledge, much less oppose, the statements of material fact filed by Dr. Butler and the Nurse Defendants.

Despite being repeatedly warned of the strictures of summary judgment procedure,[2] Mitchell chose to ignore those rules by filing purported motions for summary judgment that do not contain all the required elements of such a motion, and by failing to properly dispute Defendants' proffered facts with citations to relevant, admissible evidence. These infirmities cannot be overlooked. *Stevo v. Frasor*, 662 F.3d 880, 886–87 (7th Cir. 2011) (district judges "are entitled to insist on strict compliance with local rules designed to promote the clarity of summary judgment filings"); *Coleman v. Goodwill Indus. of Se. Wis., Inc.*, 423 F. App'x 642, 643 (7th Cir. 2011) ("Though courts are solicitous of *pro se* litigants, they may nonetheless require strict compliance

---

[2]He even attached a copy of Local Rule 56 to his January 27, 2017 motion for summary judgment. *See* (Docket #137 at 2–6).

with local rules."); *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006) ("[E]ven *pro se* litigants must follow rules of civil procedure.").

Though the Court is required to liberally construe a *pro se* plaintiff's filings, it cannot act as his lawyer. The Court will not mine Mitchell's submissions for helpful evidence. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). Consequently, the Court must find most of the relevant facts undisputed. *See Hill v. Thalacker*, 210 F. App'x 513, 515 (7th Cir. 2006). Unless stated otherwise, the Court will deem Defendants' facts undisputed for purposes of deciding their motions for summary judgment. *See* Fed. R. Civ. P. 56(e). However, the Court has generously reviewed all of Mitchell's filings and will discuss his disputes as to the facts where relevant.[3]

### 3.2     Facts Pertinent to the Disposition of Defendants' Motions[4]

-----

[3]In the midst of the summary judgment briefing schedule, and after Mitchell filed his responsive materials to Defendants' motions, Mitchell filed a motion to compel discovery responses. (Docket #140). The motion seeks an order from the Court compelling Defendants to provide certain documents and video footage, as well as responses to certain of his interrogatories. *Id.* The motion will be denied for several reasons. First, the Court already granted Mitchell an extension of time to complete his review of Defendants' discovery production. (Docket #124). The Court instructed that no further extensions of time for discovery would be granted. *Id.* at 2. The Court even enforced that ruling against Mitchell once before when he tried to serve new discovery requests at the end of the extension period. (Docket #128). The Court will do so again in this instance, particularly since the motion, even if it had been timely filed, would be denied on its merits, as it offers no argument or evidence whatsoever in support of the requested relief.

[4]This narrative touches only tangentially on the actions of Dr. Butler and the Nurse Defendants. Mitchell did not meaningfully respond to their motions, and the Court need not set out the facts regarding these Defendants at length to find that they are entitled to summary judgment. Instead, the Court will address Mitchell's claims against them and the relevant undisputed facts in its analysis below.

### 3.2.1 Medical Care at Sheboygan

At the time of the events relevant to his complaint, Mitchell was a pretrial detainee at Sheboygan. Sheboygan contracts with a private healthcare company, Advanced Correctional Healthcare, Inc. ("ACH"), to provide medical and mental health services to inmates. Dr. Butler is a physician who works for ACH at Sheboygan. Unless there is a medical emergency, inmate medical care is handled exclusively by ACH doctors and nurses, not Sheboygan correctional staff.[5]

To obtain medical care at Sheboygan, inmates normally need to submit a written request for the same. Verbal requests made to correctional staff are not honored unless the officer observes that the inmate is in medical emergency. When an ACH triage nurse evaluates a written request for care, he or she will assess whether there is a medical emergency, the inmate's medical history, and the inmate's credibility in requesting medical care. Correctional staff play no part in that determination, or in deciding what course of action is medically appropriate. Rather, correctional staff defer to the medical professionals' judgment on the proper course of treatment and cooperate with their orders to the extent correctional staff must participate in non-medical tasks as part of the inmate's care.

Prior to his detention at Sheboygan, Mitchell had suffered multiple gunshot wounds. He sought treatment at Sheboygan for chronic pain associated with those injuries. However, he was often harassing and behaved inappropriately toward the medical staff, and he was non-compliant with the prescribed course of treatment. Mitchell also had a lengthy history of

---

[5]Mitchell asserts that correctional officers participate in passing medications to inmates, (Docket #133 at 1), but this fact, if true, does not establish that correctional staff become involved in medical care outside of emergencies.

discipline at Sheboygan. While there, he was disciplined for: lying to, obstructing, and disrespecting officers; disrupting jail security and activities; manufacturing intoxicants; fighting with other inmates; sexually threatening and assaulting other inmates; possessing contraband; and interfering with correctional officers while in the performance of their duties.[6] Additionally, Mitchell was charged with felony battery of a fellow prisoner at Sheboygan.

### 3.2.2 August 29, 2015 Incident with Sergeant Richter

The focal point of this lawsuit arose from an encounter between an officer and Mitchell on August 29, 2015. That day, Mitchell was kicked out of the law library for chatting with another inmate. In the past, Mitchell had been caught doing the same thing, and on those occasions, he had ignored the officers' directives. As a result, on those prior occasions he was placed in segregation in the contact visiting area, or "Con area," of the jail. On those prior occasions, Mitchell had both actively and passively resisted the officers' orders, including by walking very slowly and stopping repeatedly.

On August 29, 2015, as he walked out of the law library, Mitchell began to yell loudly. Sergeant Mark Richter ("Richter") was in the control room at the time and could both see Mitchell leaving the library and hear him shouting. As Mitchell passed the control room, Richter stepped out and directed Mitchell to come back and head to the Con area. Mitchell insisted he be given a reason for the order, but Richter told him no explanation was required. Mitchell began walking very slowly to the Con area, so correctional officer Iverson ("Iverson"), came to assist Richter. Mitchell claims that he was

---

[6]Mitchell claims he had no lengthy disciplinary history, citing what appears to be a single conduct report he received that was dismissed. (Docket #133 at 2). The document he submitted, however, is totally illegible and, as a result, inadmissible. (Docket #137-1 at 116); Fed. R. Civ. P. 56(c)(2). Nor would vindication from one disciplinary report undermine the rest of Mitchell's disciplinary history.

walking as quickly as he could, attributing his slow pace to his old gunshot wounds and the chronic pain they cause. (Docket #137-1 at 23–24); (Docket #147 ¶ 13).

Surveillance footage shows that upon arriving at the door to Cell 2 of the Con area, Mitchell opened the door but did not enter. Instead, he let the door close and told the officers that he would not go into the cell because it did not have a mattress. Richter opened the cell door and directed Mitchell to enter. As Richter did so, Mitchell stood back without entering and allowed the door to close again. Richter opened the door again, held it open this time, and again directed Mitchell to enter. Mitchell made a slight movement toward the door but stopped again. Richter then placed his hands on Mitchell's back and pushed him into the cell. Mitchell stumbled a few feet forward at the push.[7] His head remained in a neutral posture and he did not fall or hit anything before recovering. Richter then secured the door and told Mitchell that he would issue him a conduct report for failure to follow staff directives. As the officers left the Con area, Mitchell started shouting that he was going to "bitch slap" Richter.

Mitchell recounts the final moments of his encounter with Richter differently. According to him, Richter brusquely refused Mitchell's request for a mat. As Mitchell then began walking into the cell, Richter then shoved Mitchell inside, yelling, "fucking nigger get your ass in there." (Docket #137-1 at 23–24); (Docket #147 ¶¶ 16–18). Mitchell alleged that the push caused his neck to "snap" back, injured his neck, and "re-injured" his back. *See* (Docket #147 ¶ 19). Mitchell submitted the affidavit of another inmate, Donald Polk

---

[7]The term "stumble" is generous—Richter's push essentially caused Mitchell to take one overlong stride on his way into the cell.

("Polk"), who was housed in the Con area at the time of this incident and who corroborates Mitchell's version of events. *Id.* at 18.

While Mitchell was in Cell 2 of the Con area, he pushed the intercom button and requested an ambulance for alleged severe pain. Correctional officer Hansen ("Hansen") was working in the control room where there was video of Cell 2. She observed that Mitchell did not appear to be in any distress or discomfort, nor was he exhibiting any unusual behavior or any signs that he was in any pain or injured. Hansen concluded that Mitchell was not experiencing a medical emergency and did not require immediate first aid. Based on her assessment, Hansen answered the call and denied Mitchell's request for an ambulance.

Surveillance footage shows that Mitchell was in Cell 2 for about an hour and a half. While in this cell, Mitchell did not exhibit any signs of acute distress or serious injury. He sat on the bed, walked around the cell, and occasionally spat into the toilet. He also touched his hand to his neck on occasion, but he did not do so consistently.[8] When Iverson came back at Cell 2, Mitchell immediately placed his left hand on the left side of his neck and kept his hand there as he spoke to Iverson through the cell window. Iverson then opened the cell door and Mitchell exited, still with his left hand on his neck. At this point, Mitchell was moved to Cell 1 of the Con area for a while. Sometime later, he was taken to the dayroom of the "S" pod in the jail. Mitchell kept his hand on his neck during his walk to the dayroom.

_____

[8]Defendants offer no evidence as to the involvement of Defendant Johnson in the events of August 29, 2015, or the case as a whole. *See* (Docket #108). Mitchell alleges that at some point during his stay in the Con area, Johnson walked through. (Docket #136 at 3). Mitchell asked him to call an ambulance, doctor, or nurse, but Johnson refused. *Id.* The Court takes these allegations as true for present purposes.

Surveillance video shows that while in the dayroom, Mitchell generally looked up at the television mounted high on the wall or spoke with other inmates. Mitchell did not exhibit any signs or symptoms of injury or distress. He occasionally and briefly touched his neck but did not display any difficultly in turning his head in any direction. This lasted about an hour.

### 3.2.3   Requests for Medical Care After August 29, 2015

Mitchell submitted six written requests for medical care between August 29 and August 30, 2015. In each, he alleged he was experiencing back and/or neck pain as a result of being pushed by Richter. In one request, he stated that he could not turn his head fully. All of these requests were answered on September 2, 2015. On that date, a nurse conducted a full examination of Mitchell and determined that he had a normal range of motion in his neck. Dr. Butler nevertheless gave him a three-day prescription of Tylenol and Flexeril for his subjective complaints of pain.

Between September 4 and September 6, 2015, Mitchell submitted four more requests for medical care, alleging pain in his back, neck, and legs. Again, he complained that he could not turn his head without sharp pain. He attributed this pain to Richter's push and also a "metal rod in his femur" which was inserted because of his prior gunshot wounds. (Docket #137-1 at 35). Nurse Tracy Lund responded on September 8, 2015, advising Mitchell that Dr. Butler had ordered an x-ray and passive range-of-motion exercises 2–3 times daily to address his complaints. Dr. Butler saw Mitchell in person that day as well. During the visit, Mitchell refused to be examined. However, Dr. Butler determined that his gait was normal and that he could sit and stand without any problems. Dr. Butler also noted that Mitchell said his neck pain was "chronic" and that he "always had neck problems."

Dr. Butler suggested that Mitchell use a warm compress on his neck for the pain.[9] She also ordered a 72-hour activity log to monitor Mitchell's compliance with her range-of-motion exercise order and to generally observe his level of pain. The x-ray came back with normal results, and the activity log showed that Mitchell exercised his back and neck only one time and was otherwise "sitting" and "standing watching TV" with no complaints of pain. Mitchell counters that he was diligently performing the prescribed exercises. (Docket #133 at 1, 4); (Docket #137-1 at 47).

These examinations and several that came after confirmed to Dr. Butler that Mitchell had no objective signs of pain nor any discernible source for his complaints of pain attributed to Richter's push. Instead, Mitchell's prior gunshot wounds were the only condition causing Mitchell pain, and ACH staff were already treating that condition. Mitchell believes, however, that their decisions to offer treatment, including medication and exercises, shows that he was in fact seriously injured by Richter's shove and that ACH staff found his complaints credible. *See* (Docket #133 at 6–7).

### 3.2.4    September 17, 2015 Incident with Officer Krueger

The next episode in Mitchell's complaint occurred on September 17 to 18, 2015. He claims that correctional officer Krueger ("Krueger") did not give him his prescribed pain medication on one of those mornings. Mitchell submitted a written request for medical care on September 19, 2015, alleging

---

[9]This suggestion spawned a great deal of consternation from Mitchell. On September 9, 2015, correctional officers cited him for being "belligerent" and "argumentative" when complying with an order to remove a t-shirt tied around his neck. (Docket #137-1 at 38–39). Afterward, he contested the citation, arguing that the t-shirt was a towel and that Dr. Butler had indicated that he should use a towel in this fashion to help alleviate his neck pain. *See id.* at 45. Mitchell makes much of the towel incident throughout his briefing, but it is not the subject of any of his claims in this case, and the Court will not assess its merits *sua sponte*.

that Krueger gave his medication to a different inmate. *See* (Docket #133 at 4). However, medical staff, not correctional officers, dispense medications to inmates.[10] For the days in question—September 17 and 18—records reflect that Mitchell received this drug both mornings from a nurse. Krueger did not pass morning medications on either day.

Further, there is no record that Mitchell experienced or complained of increased pain specifically resulting from the alleged missed dose of medication, although he filed numerous requests for care around this time alleging continued pain from the Richter incident and Dr. Butler's alleged substandard care. He also filed a complaint asking not to be charged for medication he did not believe he had taken. *See* (Docket #147 ¶¶ 49–50).

As a result of his numerous requests for care at this time, Dr. Butler saw Mitchell again on September 22, 2015. He claims that she would not allow him to fully describe his symptoms and denied his requests for additional pain treatment. He filed an inmate grievance against her the next day. Mitchell further alleges that ACH staff stopped responding to his repeated requests for care after September 25, 2015, but the medical record shows that ACH staff responded to each of his requests for medical care. (Docket #104-1).

### 3.2.5   October 26, 2015 Court Appearance

On October 26, 2015, Mitchell had to attend a scheduled court hearing. Sergeant Fenn ("Fenn") was present at Sheboygan that day. Corporal Walter ("Walter") arrived via a secure elevator that connected the jail to the

---

[10]Mitchell asserts that correctional officers participate in passing medications to inmates, (Docket #133 at 1), but one of the documents he cites in support is not legible, and the other is from March 2016. (Docket #137-1 at 111, 115). Neither has any bearing on what Krueger did in September 2015.

courthouse in order to escort Mitchell to the hearing. Until he stepped into the elevator, Mitchell made no complaints of pain and exhibited no symptoms or behavior indicating that he was in pain. Fenn was aware that Mitchell had been filing numerous requests for medical care over the past six to eight weeks relating to neck, back, and leg pain. Fenn was also aware that medical staff had evaluated and were treating those complaints.

Mitchell states that while in the elevator, he complained to Walter that he was experiencing severe pain and asked for an ambulance. Walter decided to return to the jail to discuss the matter with Fenn. Mitchell and Walter returned to Fenn in the jail, and Walter explained Mitchell's complaint and request for an ambulance. Fenn then asked Mitchell if he was complaining about the same pain he had been complaining about to ACH staff for the past several months. Mitchell responded in the affirmative but noted that the pain had increased. (Docket #137-1 at 61). Based on this response, Mitchell's demeanor, the lack of any objective indication that Mitchell was experiencing a medical emergency or in need of immediate first aid, and the knowledge that Mitchell was already receiving treatment for his pain, Fenn determined that Mitchell did not require emergency medical treatment. He told Mitchell to submit a written request for care and advised Walter that he could escort Mitchell to the hearing. *Cf.* (Docket #147 ¶¶ 70–76).

### 3.2.6   November 3, 2015 Incident with Officer Hansen

Next is Mitchell's complaint against Hansen for alleged mistreatment on November 3, 2015. That evening, Mitchell was watching television in "P" pod in the jail. Hansen made her rounds of the area. She did not observe that Mitchell was in any distress or discomfort, nor did she see him exhibit any unusual behavior or symptoms suggesting that he was in pain or injured. As she walked by him, Mitchell said that his neck hurt and that he needed

medical attention. Hansen then spoke with another inmate sitting near Mitchell, who reported that Mitchell had been complaining of pain all day and needed medical attention. (Docket #137-1 at 67); (Docket #147 ¶ 81). Based on Mitchell's demeanor and the lack of objective indications that he was experiencing a medical emergency or in need of immediate first aid, Hansen denied his verbal request for medical attention and directed him to submit a written request for care. On her subsequent rounds that night, Mitchell did not appear to be in any distress or discomfort as he continued to watch television and interact with other inmates.

### 3.2.7    Mitchell's Inmate Grievances

Mitchell submitted inmate grievance forms on October 28, November 15, and December 29, 2015, and on January 1, January 12, January 19, and January 20, 2016 related to his belief that ACH staff were ignoring his requests for care since September 25, 2015, and that Dr. Butler was providing inadequate treatment. During the period from August 29, 2015 to January 19, 2016, Mitchell submitted over eighty written requests for medical care alleging neck, back, and leg pain. As noted above, jail records show that despite his allegations otherwise, the medical staff responded to each request. *See* (Docket #104-1). Further, he admits in these grievances that he was seen by nurses daily, that Dr. Butler had seen him several times, and that he had been prescribed pain medication. He nevertheless maintained that this medical care was insufficient—he wanted ACH staff to attend to him more often and he wanted Dr. Butler to prescribe narcotic pain medication. Yet on January 22, 2016, Mitchell met with a mental health services staff member and stated that "his goal is to emotionally destroy a certain staff member" with his grievances and requests for care. (Docket #113-3 at 31).

Captain Brinkman ("Brinkman") responded to some of these grievances after investigating Mitchell's allegations. For instance, Brinkman spoke with the medical manager at the jail, nurse Tracy ("Tracy"), following Mitchell's October 28, 2015 grievance so that Brinkman could get a synopsis of Mitchell's medical history and treatment. He learned during this conversation that Mitchell had been submitting an excessive number of duplicative requests for care and that ACH staff were already doing everything they felt was medically appropriate to care for him. Tracy also informed Brinkman that Mitchell was not following his treatment recommendations, including the range-of-motion exercises Dr. Butler prescribed to relieve his pain.

Brinkman responded to Mitchell about his October 28, 2015 grievance within twenty-four hours. He informed Mitchell that he had asked jail medical staff to "stay in tune" with Mitchell's medical concerns and "address them in an expeditious manner with any necessary and appropriate monitoring and adjustments." Likewise, Brinkman responded to the November 15, 2015 grievance the day it was submitted, advising Mitchell that "[i]f you submit a medical request, 1 form is satisfactory; no need for 3 per day unless the request is of a different subject matter. I will ask that medical review your status and [your] request to see Dr. Butler."

After Mitchell was seen by Dr. Butler on November 24, 2015, he submitted a grievance alleging that "the major[ity] of the time I spent in Dr. Butler's office resulted in a debat[e] of Dr. Butler telling me that I am not suffering from the pain that I described to her." Brinkman responded to this grievance, noting that, "[a]s an inmate in this institution, you are at somewhat of a disadvantage because you are not in a position to go elsewhere for your care and choose another physician or medical provider."

However, Brinkman offered supportive statements, too, inquiring as to what specifically Mitchell believed was inadequate about Dr. Butler's care and what Mitchell would like to see in his care going forward.

The timeline of this case extends well beyond this point, until mid-2016, and includes Mitchell's continued complaints about Richter, Brinkman, and the ACH medical staff, but the foregoing are the only material facts necessary to dispose of the present motions.

4.      **ANALYSIS**

Mitchell brings a Fourteenth Amendment claim for excessive force against Richter. He also brings claims of deliberate indifference to his serious medical needs, in violation of the Fourteenth Amendment, against the other defendants based on the medical care provided by ACH staff and the other episodes described above. The Court will first discuss the excessive force claim, then turn to the deliberate indifference claims.

### 4.1      Excessive Force Claim Against Richter

The Eighth Amendment prohibits the "unnecessary and wanton infliction of pain" on prisoners. *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001). The Eighth Amendment is typically applied to claims of excessive force against incarcerated persons. However, pretrial detainees like Mitchell are not protected by the Eighth Amendment. *Lewis v. Downey*, 581 F.3d 467, 473 (7th Cir. 2009). Instead, Mitchell's claim is properly sited in the Fourteenth Amendment Due Process Clause. *Id.* This distinction is important, since the Due Process Clause prohibits all "punishment," whereas the Eighth Amendment proscribes only punishment that is "cruel and unusual." *Id.* at 473–74. This is because a pretrial detainee has not been convicted of a crime and may not be punished at all, whereas a convicted prisoner can be

punished within constitutional limits. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *Graham v. Connor*, 490 U.S. 386, 395, n.10 (1989).

The Supreme Court has recently provided specific instruction on how to analyze a Fourteenth Amendment excessive force claim. In *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), the Court explained that a Fourteenth Amendment excessive force claim lacks the subjective state-of-mind component applicable to a similar claims raised under the Eighth Amendment. *Id.* at 2472. In particular, a pretrial detainee does not have to present evidence that the defendant acted "maliciously and sadistically to cause harm." *Id.* at 2475. All that he must show is that "the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 2472–73.[11]

The reasonableness standard is not to be applied mechanically but must adapt to the facts and circumstances of each particular case. *Id.* at 2473. The officer's action must be viewed "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* Additionally, the court must "account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Id.* (quoting *Bell*, 441 U.S. at 540). The *Kingsley* Court announced the following non-exclusive list of relevant factors in this inquiry: (1) the relationship

---

[11]Defendants do not even mention *Kingsley* in their briefs. Indeed, Defendants incorrectly assert that the Eighth Amendment's state-of-mind inquiry can be "borrowed" to analyze Mitchell's claim. *See* (Docket #107 at 18–19). Defendants' failure to cite to and grapple with applicable precedent from the Supreme Court gives this Court some cause for concern.

between the need for the use of force and the amount of force used; (2) the extent of the plaintiff's injury; (3) any effort made by the officer to temper or to limit the amount of force; (4) the severity of the security problem at issue; (5) the threat reasonably perceived by the officer; and (6) whether the plaintiff was actively resisting. *Id.*[12]

The instant lawsuit grew from a single shove inflicted by Richter. To be sure, this is a use of force. But Applying the *Kingsley* factors demonstrates that no reasonable factfinder could conclude that Richter's use of force was objectively unreasonable. Critical to this analysis and the Court's conclusion is the surveillance video of the incident. This video provides the definitive source for the facts notwithstanding the favorable standard of review for Mitchell. *Scott v. Harris*, 550 U.S. 372, 378–81 (2007). In *Scott*, the Supreme Court found that despite having to draw reasonable inferences in favor the non-movant on summary judgment, the court did not have to believe the non-movant's version of events when a videotape existed that "utterly discredited" it. *Id.* The Court observed that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* That is the case here, since no reasonable jury could believe Mitchell's allegations of what happened in light of the videotape.

---

[12]Because Mitchell's claim ultimately fails on these objective considerations, there is no meaningful difference between the Court's analysis here and a hypothetical analysis under the Eighth Amendment. The Supreme Court in *Hudson* promulgated a list of objective factors similar to those given in *Kingsley* for excessive force claims under the Eighth Amendment. *See Hudson v. MacMillian*, 503 U.S. 1, 7 (1992). Thus, although Mitchell incorrectly believes that he is making an Eighth Amendment claim, *see* (Docket #136 at 1–2), it does not affect the result.

First, the undisputed facts show that Richter had reasonable cause to use force, since Mitchell repeatedly refused to enter Cell 2. The videotape corroborates his version of events, showing that Richter opened the door several times but Mitchell did not enter. Mitchell does not claim that Richter's order was unreasonable, only that he wanted to have a mat in the cell with him. This request being refused, Mitchell should have complied with Ricther's order. He did not, and, considering his long history of insubordination, Richter then had sufficient cause to apply a modicum of force to maintain institutional order. *See Guitron v. Paul*, 675 F.3d 1044, 1046 (7th Cir. 2012) (no excessive force where the officer "did not use any force until [the inmate] disobeyed a command that was designed to maintain order within the prison"); *Soto v. Dickey*, 744 F.2d 1260, 1267 (7th Cir. 1984) ("Inmates cannot be permitted to decide which orders they will obey, and when they will obey them.").

The video further demonstrates that the force applied was moderated by the needs of the situation. Mitchell was not physically resisting Richter or Iverson at the time but was nevertheless refusing to enter Cell 2. In this instance, severe force would have been inappropriate, as Mitchell posed no physical danger to the officers or himself. Richter's push on Mitchell's back was not an unreasonable amount of force under these circumstances. Contrary to Mitchell's belief, no reasonable trier of fact could conclude, viewing the videotape, that Mitchell's head "snapped back" as he alleges. At most, Mitchell stumbled forward a few feet but did not even fall or hit anything before catching himself. His characterization of the encounter is, quite simply, blatantly contradicted by the videotape.

Finally, the Court notes that, as will be discussed more fully below, Mitchell appears to have suffered no actual injury as a result of the incident.

*See* Part 4.2.1. Of course, the rest of this case is based in Mitchell's ongoing complaints of severe neck pain which Richter allegedly caused. But ACH staff concluded that Mitchell's complaints were subjective and that he was otherwise in normal condition (save for his prior gunshot injuries). And Mitchell himself marshals no evidence to substantiate his claims of pain against the tide of contrary medical evidence. Thus, even if one could fault Richter for using too much force relative to the needs of the situation—something the Court does not do here—the lack of injury is fatal to Mitchell's claim. *See Outlaw*, 259 F.3d at 839 (no Eighth Amendment claim where the officer "deliberately and perhaps unnecessarily applied a relatively minor amount of force to achieve a legitimate security objective"). Although it comes from the Eighth Amendment context, the Supreme Court's teaching in *Hudson* is apt here: "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).

Mitchell asserts that Richter's shove was malicious, unprovoked, and racially motivated. (Docket #134 at 1). The video belies the first two assertions. As to the final one, the tape does not have audio, so the Court is unable to determine from that source what may have been said. Based on the sworn statements of Mitchell's fellow inmate that a racial epithet was used, the Court must assume that it did in fact occur. But the remark, while reprehensible, does not transform an objectively reasonable application of force on its head. Mitchell is not suing for verbal harassment. Instead, he claims that Richter's shove caused him injury. To Mitchell, the racially derogatory comment represents Richter's malicious state of mind—something he does not have to prove here. *Kingsley*, 135 S. Ct. at 2475.

Thus, while the Court would condemn such language, the single use of this word does not mean that Richter applied excessive force. And because no reasonable jury could conclude otherwise, this claim must be dismissed.

### 4.2 Deliberate Indifference Claims

Mitchell's claims against every other defendant are for deliberate indifference to his serious medical needs. Again, because he is a pretrial detainee, it is not the Eighth but the Fourteenth Amendment that provides a constitutional basis for the claim. Yet unlike excessive force claims, the standards applicable to deliberate indifference claims brought under the Eighth and Fourteenth Amendments are functionally identical. *Smith v. Dart*, 803 F.3d 304, 309 (7th Cir. 2015); *Phillips v. Sheriff of Cook Cnty.*, 828 F.3d 541, 554 n.31 (7th Cir. 2016).

For such a claim, the plaintiff must prove: (1) an objectively serious medical condition; (2) that the defendant knew of the condition and was deliberately indifferent in treating it; and (3) this indifference caused the plaintiff some injury. *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). The deliberate indifference inquiry has two components. "The official must have subjective knowledge of the risk to the inmate's health, and the official also must disregard that risk." *Id.* Even if an official is aware of the risk to the inmate's health, "he is free from liability if he 'responded reasonably to the risk, even if the harm ultimately was not averted.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 843 (1994)).

Negligence cannot support a claim of deliberate indifference, nor is medical malpractice a constitutional violation. *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976); *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). The question is not whether the plaintiff believes some other course of treatment would have been better. *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996). Instead, he must

prove that the defendant's treatment decisions were "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261–62 (7th Cir. 1996). Put differently, the plaintiff must show that his medical providers made treatment decisions "'so dangerous' that the deliberate nature of [their] conduct can be inferred." *Gayton*, 593 F.3d at 623 (quoting *Qian v. Kautz*, 168 F.3d 949, 955 (7th Cir. 1999)); *see also Walker v. Zunker*, 30 F. App'x 625, 628 (7th Cir. 2002) ("Mere dissatisfaction with a particular course of treatment, or even malpractice, does not amount to deliberate indifference."). Courts must "examine the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to his serious medical needs." *Dunigan ex rel. Nyman v. Winnebago Cnty.*, 165 F.3d 587, 591 (7th Cir. 1999).

Non-medical prison officials are generally entitled to rely on the expertise of medical personnel. *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011); *Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005) ("'If a prisoner is under the care of medical experts, a non-medical prison official will generally be justified in believing that the prisoner is in capable hands.'") (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)). This is because "holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain [the] division of labor" within the prison. *Spruill*, 372 F.3d at 236. Accordingly, non-medical prison officials can be liable for deliberate indifference to an inmate's medical needs only where "they have 'a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner.'" *Hayes v. Snyder*, 546 F.3d 516, 525 (7th Cir. 2008) (quoting *Spruill*, 372 F.3d at 236). This standard

is quite high. If a non-medical prison official does not ignore the inmate but instead investigates the inmate's complaint and refers them to the appropriate medical staff, his duty is at an end. *Greeno*, 414 F.3d at 656; *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) ("As a nonmedical administrator, [defendant] was entitled to defer to the judgment of jail health professionals so long as he did not ignore [the inmate].").

### 4.2.1  Objectively Serious Medical Condition

Defendants challenge whether Mitchell suffered from a serious medical condition sufficient to sustain a constitutional claim. For a deliberate indifference claim, Mitchell has to demonstrate that his medical needs were "objectively, sufficiently serious." *Perkins v. Lawson*, 312 F.3d 872, 875 (7th Cir. 2002). A prisoner's medical need is objectively serious if it is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Zentmyer v. Kendall Cnty.*, 220 F.3d 805, 810 (7th Cir. 2000). The medical condition need not be life-threatening; "it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton*, 593 F.3d at 620. Mitchell's medical file indicates that Dr. Butler and the nursing staff examined him on multiple occasions and performed diagnostic testing but found absolutely nothing wrong with him that could be attributed to the Richter incident. Additionally, the videotape confirms that no lay person could easily recognize that the Richter incident caused Mitchell any injury at all, much less a serious one.

Although Mitchell apparently suffered from chronic conditions related to gunshot wounds received years earlier, medical staff were actively treating these complaints. There is no evidence substantiating his claims of neck or

back injury at Richter's hands, other than his repeated representations to that effect. Indeed, in January 2016 he admitted to a mental health counselor that his goal was "to emotionally destroy a certain staff member" through his constant medical complaints. (Docket #108 ¶ 101). Thus, Mitchell's claims fail for a lack of evidence of an objectively serious medical condition. *See Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008) (finding complaint of pain constituted an objectively serious condition when substantiated by medical records showing a source of injury). Further, as explained below, even if Mitchell's condition was sufficiently serious, the Court also finds that none of the Defendants were deliberately indifferent to his professed complaints of pain.

### 4.2.2 Dr. Butler and the Nurse Defendants

Mitchell included in his complaint allegations of deliberate indifference to his serious medical need against the Nurse Defendants and Dr. Butler. However, as noted above, although Mitchell submitted materials responsive to the Officer Defendants' motion for summary judgment, he submitted nothing directly addressing the motions for summary judgment filed by the Nurse Defendants and Dr. Butler. Because of this, the Court finds that all their statements of material fact are undisputed. *See supra* Part 3.1. On those facts, no reasonable factfinder could conclude that these Defendants violated Mitchell's constitutional rights.

As to Dr. Butler, Mitchell claims that she was deliberately indifferent to his medical needs at their appointments on September 22 and November

24, 2015.[13] He says that she would not listen to all of his concerns and that she would not prescribe him stronger pain medications, including oxycodone. (Docket #137-1 at 50). He claims that, as a result, he suffered increased pain and blurred vision. (Docket #136 at 7). Yet Dr. Butler's examinations on September 8, September 22, and November 24 were all uniform: nothing was wrong with Mitchell's neck or back. X-rays were normal, and her examinations revealed no problems with Mitchell's range of motion and no pain on palpitation. She nevertheless prescribed pain medication and range-of-motion exercises to address Mitchell's subjective complaints of chronic pain. She also suggested that he turn to mental health treatment, since she believed that his complaints of pain might have been precipitated by depression or other mental disorders.

As to the Nurse Defendants, Mitchell does not clearly identify what each nurse did or did not do, instead blaming them as a group for failing to respond to his requests for care. As shown above, this is simply untrue; they responded to each request. The failure to identify specific conduct by particular individuals is also problematic. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). Further, to the extent Mitchell makes more specific claims, such as that Nurse Nick falsified dates his medical request forms, Mitchell offers no supporting evidence. Additionally, the first time this claim was aired was in his summary judgment briefing, which is not the proper place to raise new claims. *Messner v. Calderone*, 407 F. App'x 972, 974 (7th Cir. 2011). Moreover, the record reflects that in addition to responding to each of his

---

[13]Dr. Butler says she was not notified that Mitchell was complaining about his care on November 24, 2015 until discovery. Because summary judgment is appropriate in her favor anyway, the Court will assume that Mitchell's claim against Dr. Butler encompasses this date.

many requests for care, the nursing staff personally examined Mitchell on numerous occasions. *See* (Docket #102 at 13–15) (listing instances of Mitchell's nursing appointments).

Mitchell's allegations fall well short of showing that Defendants were deliberately indifferent to his medical needs. First, in a case like this one where the source of the injury itself is not at all obvious, Mitchell's lay opinion, without more, is inadequate to show that these defendants failed to provide proper care. *Estate of Cole*, 94 F.3d at 261–62; *Reynolds*, 84 F. App'x at 674. Second, the record belies Mitchell's belief that his requests for care were being ignored. (Docket #104-1). If Mitchell was unsatisfied with their responses, that is a different claim from being ignored. Furthermore, the record shows that Mitchell simply did not submit forms between September 25 and December 11, 2015 for *medical* care. He asked repeatedly for mental health care during this time, but this was unrelated to complaints of neck and back pain.

Third, if Mitchell is unhappy that ACH staff chose conservative pain treatments, this does not support a deliberate indifference claim absent a showing that they knew that their chosen treatment methods would be ineffective. *See Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006); *Reynolds v. Barnes*, 84 F. App'x 672, 674 (7th Cir. 2003) ("[T]he Constitution does not mandate that a prisoner receive exactly the medical treatment he desires."). The evidence suggests the opposite, however, since the Nurse Defendants and Dr. Butler came to considered treatment decisions based on the relevant facts available to them at the time, thereby providing Mitchell with "adequate, reasonable medical treatment." *Johnson*, 433 F.3d at 1014; *Snipes*, 95 F.3d at 592 ("A prisoner's dissatisfaction with a doctor's prescribed course of treatment does not give rise to a constitutional claim unless the

medical treatment is 'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition.'") (quoting *Thomas v. Pate*, 493 F.2d 151, 158 (7th Cir. 1974)).

To sustain his claim, Mitchell needed evidence that Defendants' treatment decisions were "so inadequate that [they] demonstrated an absence of professional judgment, that is, that no minimally competent professional would have [done the same] under those circumstances." *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 989 (7th Cir. 1998). No such evidence exists in this case. Indeed, although these Defendants viewed Mitchell's complaints of pain as subjective and not substantiated by objective testing, they did not dismiss him out of hand as a malingerer. *See Greeno*, 414 F.3d at 654. Moreover, despite his claim that the medications and exercises prescribed to him were ultimately ineffective, this alone does not amount to deliberate indifference. *See Thomas v. Wahl*, 590 F. App'x 621, 624 (7th Cir. 2014) (finding no deliberate indifference where physician engaged in a lengthy and conservative course of pain treatments).

Finally, there is no evidence that ACH staff caused overlong delay between Mitchell's medical appointments. While it is true that a delay in treatment can establish deliberate indifference, "'verifying medical evidence' must exist to show how the delay adversely affected a patient's condition." *Reynolds*, 84 F. App'x at 674 (quoting *Langston v. Peters*, 100 F.3d 1235, 1240–41 (7th Cir. 1996)); *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007). "[T]he length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment." *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010). Mitchell acknowledges that he saw medical staff practically daily. He also saw Dr. Butler three times in a period of about three months. Defendants therefore maintained very consistent attention to

Mitchell's complaints. Moreover, any delays between appointments cannot be seen as constitutionally infirm since Mitchell's condition was not so severe as to warrant immediate treatment. *See Perez v. Fenoglio*, 792 F.3d 768, 778 (7th Cir. 2015) (finding that 24-hour delay in medical care was actionable where inmate had a gaping wound).

On this record, the Court, viewing the course of Mitchell's care holistically, finds that no reasonable jury could conclude that the Nurse Defendants or Dr. Butler acted with deliberate indifference to his medical needs. *Dunigan*, 165 F.3d at 591. As a result, his claims against them must be dismissed.

### 4.2.3   The Officer Defendants

As to the deliberate indifference of the Officer Defendants, Mitchell's theory is that they systematically ignored his oral complaints for months. The undisputed facts, viewed favorably to Mitchell's claims, do not sustain that theory. Nothing in the record suggests that any of the Officer Defendants were deliberately indifferent to Mitchell's medical needs. Rather, each discharged their limited duty by acknowledging his complaints rather than ignoring them.

Because Mitchell was not in a medical emergency and was receiving treatment from medical professionals, in none of these instances was an officer remiss in instructing Mitchell to submit request for care rather than be provided emergency medical services. *See Greeno*, 414 F.3d at 656; *Spruill*, 372 F.3d at 236. Thus, Iverson, Johnson, Fenn, Walter, and Hansen, who Mitchell alleges denied his verbal requests for emergency medical care at various

times, did not display deliberate indifference to his medical needs.[14] In each instance, even though Mitchell asserted that he suffered from extreme pain, he did not exhibit external signs of that pain, nor did he display symptoms requiring immediate medical care. These officers were not wrong to deny him the care he asked for. Rather, they reasonably relied on the expertise of the medical professionals who were treating Mitchell's alleged pain. *See Greeno*, 414 F.3d at 656.

Neither does Mitchell have a claim against Krueger, who allegedly gave Mitchell's morning pain medication to the wrong inmate on September 17 or 18, 2015. Mitchell fails to dispute the assertion that Krueger did not pass medications on either morning. Additionally, Mitchell does not establish that he suffered any additional pain because of the single missed dose of medication. *Gayton*, 593 F.3d at 620 (the plaintiff must show that the defendant's deliberate indifference caused him some injury). Nor would one missed dose, even if it left Mitchell with half a day of pain, represent more than medical negligence, which the Eighth Amendment does not address. *Estelle*, 429 U.S. at 105–06.

Finally, there is Brinkman. After receiving Mitchell's grievances about his medical care, Brinkman investigated, learning about Mitchell's conditions and treatment history. Although that investigation showed that Mitchell's complaints about ACH staff were, in Brinkman's view, groundless, Brinkman nevertheless noted that he would ask the medical staff to review Mitchell's request for an appointment with Dr. Butler. When Mitchell was still unhappy

---

[14]In his briefing, Mitchell tries to add a claim that Iverson failed to protect him from Richter's use of excessive force, which Iverson witnessed. *See* (Docket #136 at 2–3). This was not a claim he pleaded, however, and even if it was, it could not be maintained since Richter did not apply excessive force. *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005).

after another visit with Dr. Butler, Brinkman again responded conscientiously, hoping to learn with more precision what Mitchell desired in his medical care. Mitchell points to no facts suggesting that he knew that the treatment provided by Dr. Butler and the Nurse Defendants was severely inadequate. *Hayes*, 546 F.3d at 525. Quite the reverse—Brinkman learned that ACH staff were attending to Mitchell's medical needs and addressing his endless stream of requests for care. Brinkman had no basis on which to question those representations, and Mitchell suggests none.

In sum, the Officer Defendants discharged what limited duty they had to attend to Mitchell's medical needs. The claims against each officer must, therefore, be dismissed.

## 5. CONCLUSION

The Court finds that Mitchell has failed to proffer evidence raising triable issues of fact as to any of his claims. Rather, on the undisputed facts and evidence in the record, the Court must grant Defendants judgment as a matter of law and dismiss this action.

Moreover, because Mitchell has proffered no competent evidence that he was ever injured, and because the video footage utterly discredits his allegations about Richter's push, the Court finds that the claims in this action are factually frivolous. *See Gladney v. Pendleton Corr. Facility*, 302 F.3d 773, 774 (7th Cir. 2002). Despite surviving to the summary judgment stage, the evidence presented here shows that Mitchell never had any viable claims; they only appeared to be so because he manufactured them that way. He has wasted the time of the Court and the funds of the taxpayer in litigating what appears to have been only a vendetta against Richter. Consequently, the Court will assess a "strike" against Mitchell pursuant to 28 U.S.C. § 1915(g). *See Turley v. Gaetz*, 625 F.3d 1005, 1012 (7th Cir. 2010).

Accordingly,

**IT IS ORDERED** that Defendant Dr. Karen Butler's motion for summary judgment (Docket #94) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Defendants nurses Brenda, Lisa, Nick, and Tracy's motion for summary judgment (Docket #100) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Defendants correctional officers Richter, Fenn, Hansen, Johnson, Iverson, Krueger, Walter, and Brinkman's motion for summary judgment (Docket #106, #122) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff Kevin Brian Mitchell's motions for summary judgment (Docket #115, #137) be and the same are hereby **DENIED**;

**IT IS FURTHER ORDERED** that Plaintiff Kevin Brian Mitchell's motion to compel discovery responses (Docket #140) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that the Clerk of Court document that this inmate has incurred a "strike" under 28 U.S.C. § 1915(g); and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 27th day of February, 2017.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge